IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

LARRY LENZ                                                                              PLAINTIFF

V.                                                             1:10-CV-179-SA-DAS

TATE COUNTY, MISSISSIPPI, ET. AL.                           DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff Larry Lenz filed this 42 U.S.C. § 1983 suit against Tate County, Mississippi and various county employees for injuries sustained while incarcerated as a pre-trial detainee at the Tate County jail. Before the Court is a Motion for Summary Judgment [35] filed by Tate County, Sheriff Brad Lance, and former Sheriff W. Shelton Ingram. For the following reasons, the Court grants the motion in part and defers ruling on the motion in part.

**BACKGROUND FACTS**

Larry Lenz was detained in the Tate County jail on several occasions throughout the summer of 2007. At approximately 5:00 p.m. on July 26, 2007, Lenz was released from jail after paying fines and making bail on pending misdemeanor charges. At approximately 11:00 p.m., Officer Jason West of the Senatobia Police Department responded to a disturbing the peace call at Lenz's mother's residence.

West found Lenz lying on the grass outside wearing socks on his hands. According to West, Lenz was only able to communicate with him using the socks on his hands as puppets.[1] Lenz eventually got up, began loudly cursing, and started to walk away. West ordered Lenz to come back,

---

[1] "He started picking grass up. I asked him what he was doing. He used it as sock puppets to talk to me through his – he could talk plain, was talking pretty plain using his motions with his socks. . . . Well, at that time, which, with the socks you could under – barely understand what he was saying but when he put the sock down, you couldn't hear nothing he was saying. He would start mumbling, like, talking out of his head, talking out of his mind."

but Lenz refused. West then arrested Lenz for disorderly conduct, "for all the yelling and cussing and all that."

After placing Lenz in his patrol car, West called an ambulance "to come check him out." Emergency Medical Service (EMS) personnel arrived on the scene and examined Lenz, who "checked out fine." West then transported Lenz to the Tate County jail for booking. Lenz was booked into the jail by Officer Joe Williams at approximately 12:25 a.m. Williams, who knew Lenz from his previous incarceration at the jail, testified in his deposition that Lenz was cooperative throughout the booking process but was "a little off balance" and had to be helped taking off his clothes and putting on his jumpsuit. He also stated that "he wasn't the same Larry" and was "talking a little crazy." However, the inmate questionnaire completed by Williams states that Lenz was not under the influence of any drugs or alcohol.

After booking Lenz and inventorying his personal property, Williams took Lenz from the booking area to cell "F-1" in the "F-Tank" section of the jail. Williams stated in his deposition that he decided to put Lenz by himself in that particular cell so "they could keep an eye on him and watch him and we wouldn't have to worry about any – you know, problems or anything like that."

According to Lenz, while walking down the hall between the booking area and his cell in F-Tank, he was struck in the head by a dark colored object and "everything turned white." Lenz's next memory is waking up days later in The Med in Memphis. According to Williams, nothing hit Lenz while he was being escorted to his cell, although he was "almost falling down," and Williams had to hold him up as he walked him to his cell.[2] After placing Lenz in his cell, Williams checked

---

[2]The Tate County jail has cameras in a number of places, however, there is no camera in the hall where Lenz claims this incident occurred. According to Plaintiff's counsel, "Before this gap, Lenz appears to be fine and uninjured, walking without aid. Immediately after the gap in

in on him around 3:30 a.m. and found nothing to be amiss.

Approximately fifteen minutes later, loud noises were heard coming from Lenz's cell. Officer Gloria Edwards went to check on Lenz and found that Lenz was injured with "blood all over the cell" and on Lenz's face and arm. Edwards called Williams to assist her. According to the incident report prepared by Edwards and Williams, no objects were found in the cell and they determined that Lenz had injured himself by hitting his head on the wall and bedrail. According to Williams, Lenz had a "little scratch" on his head and arm. Lenz was placed on suicide watch and transferred to cell HC-3. Edwards called the Senatobia Police Department to inquire if Lenz had ingested any drugs. She spoke with an Officer Massey, who stated that Lenz had admitted to using crystal meth, Xanax, and off-brand Viagra that night. Lenz denies being under the influence of any drugs that night. A subsequent toxicology report found no drugs in Lenz's system other than marijuana.

Per the jail's suicide watch policy, a staff member was to check on Lenz every fifteen minutes and make a notation in the jail's suicide watch log. However, this policy was not strictly followed, and sometimes the log reflected an hour or more between check. From 3:45 a.m. on July 27 until 5:45 a.m. on July 28, jail staff observed Lenz falling, trying to climb the walls, scratching and pulling at himself on the floor, pulling at his ear, talking to himself, and running into the walls.[3] There are no records of checks being performed during the 6:00 a.m. to 6:00 p.m. shift on July 28. Around 6:00 p.m. on the night of the July 28, Edwards observed Lenz apparently sleeping on the

---

the video, Lenz appears disoriented, staggering, and holding his ear." However, this video is not in the record.

[3]The Defendants claim the cell was padded but Plaintiff points out there is no evidence of this in the record.

3

floor of his cell. Edwards testified that at this point Lenz was naked and had smeared feces all over the cell. She also observed that his face was swollen. According to jail administrator George Hullette, he was contacted by Bessie King, another jail employee, and informed that Lenz needed medical attention. He told her to call an ambulance, and EMS arrived at the Tate County jail at approximately 8:00 p.m..[4]

Lenz was transported to the hospital in Senatobia. He had multiple contusions and lacerations on his face and ear. He was diagnosed as having a "closed head injury." A CT scan found no head or facial fractures, or brain injuries, but indicated that Lenz had a spinal fracture.[5] A toxicology screen found no drugs in Lenz's system except marijuana.

At some point, Lenz became combative with the hospital staff, necessitating the administration of multiple doses of the anti-psychotic drug Haldol and other sedatives. A decision was made to transfer Lenz to The Med in Memphis. The intake report prepared by the hospital in Memphis notes that Lenz had lacerations on his forehead and left ear, "racoon eyes," and bruises on his legs and between his buttocks. Lenz was noted as "combative" by the emergency room physician. Although listed in stable condition in Senatobia, his condition worsened to critical after arriving in Memphis and for reasons that are unclear from the medical records, Lenz had to be

---

[4] In his brief, Lenz states "However, Lenz's girlfriend's account of his release is considerably different from Hullette's. She says the jail called her and told her Lenz was being released and she could come get him. When she arrived, Lenz was brought to the front, face swollen, covered in blood, bruised, with his ear hanging halfway off, and barely able to move. She refused to take custody of him and insisted that EMS be called." The referenced statement from Lenz's girlfriend, Melissa Lentz, does not appear in the record. In any event, who made the decision to call EMS is not material to this opinion.

[5] A subsequent CT scan in Memphis found no fracture. The report from the scan performed in Senatobia indicated that it was limited by "motion artifact" and recommended repeating the scan with the patient restrained.

4

intubated. Multiple CT scans were performed which found no evidence of significant abnormalities. Lenz was discharged shortly after midnight on July 31, 2007, after having spent slightly more than two days in the hospital.[6]

Ingram, who was Sheriff at the time of these events, was not present at the jail and had no direct involvement with Lenz. Ingram first learned of the situation with Lenz when he discovered a message on his home answering from Lenz's mother on Sunday morning. The FBI subsequently instituted an investigation into the matter, but no improper conduct or violations of civil rights laws were found.

## PROCEDURAL HISTORY

On July 20, 2010, Lenz filed this 42 U.S.C. § 1983 suit against Tate County, Mississippi; the Tate County Sheriff's Department; Sheriff Brad Lance, individually and in his official capacity as Sheriff of Tate County; former Sheriff W. Shelton Ingram, individually and in his official capacity as former Sheriff of Tate County (collectively, the Tate County Defendants); the City of Senatobia, Mississippi; Jason West, individually and in his official capacity as a police officer for the Senatobia Police Department, and John Does 1-20, individually and in their official capacities as officers of Tate County, Mississippi and/or the City of Senatobia, Mississippi. On March 3, 2007, this Court entered its case management order, setting a discovery deadline of September 7, 2011. Lenz filed an Amended Complaint on June 6, 2011, apparently adding state law claims.

---

[6]Significant portions of the medical records are illegible. Plaintiff's brief describes Lenz's experience after leaving the jail as follows: "Lenz was transported to the hospital in Senatobia, and shortly thereafter transferred to the Med in Memphis because he was in critical condition and in need of life support. His injuries include severe lacerations to his left ear and forehead, anal injuries (from a possible sexual assault), multiple contusions, and head injury causing a seizure disorder," with a citation simply to "Medical Records."

5

On June 13, the Tate County Defendants filed a motion for summary judgment. The motion asserts that Defendants Ingram and Lance are entitled to qualified immunity as to the claims against them in their individual capacities. The motion also seeks summary judgment as to the federal and state claims brought against Ingram and Lance in their official capacities and against Tate County. Finally the motion asserts that the Tate County Sheriff's Department is not a cognizable entity under state or federal law. Pursuant to Local Rule 16(b)(3), all discovery not related to qualified immunity was stayed.

Lenz filed a partial response on July 25, 2011, in which he confessed the motion for summary judgment as it pertained to the state law claims and the Tate County Sheriff's Department. However, Lenz asserted that he needed additional time and discovery to adequately respond to the motion as it pertained the federal claims. In its August 9, 2011 Order [59], the Court continued the motion for summary judgment as to the federal municipal liability and official capacity claims, and granted Lenz additional time to conduct discovery related to qualified immunity. Lenz has now responded in opposition as to the issue of qualified immunity, and the issue is ripe for the Court's consideration.

**SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant." Agnew v. Washington Mut. Fin. Group, LLC, 244 F. Supp. 2d 672, 675 (N.D. Miss. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The Court is not to weigh the evidence or engage in credibility determinations. Anderson,

477 U.S. at 249, 106 S. Ct. 2505; Deville v. Marcantel, 567 F.3d 156, 164 (5th Cir. 2009). "[T]he court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Deville, 567 F.3d at 164.

However, a qualified immunity defense alters the usual summary judgment burden of proof. Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010) (citing Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005)). Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established federal law. Id. The plaintiff bears the burden of negating qualified immunity, however, all inferences are drawn in his favor. Id.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Waltman v. Payne, 535 F.3d 342, 346 (5th Cir. 2008) (citation omitted). To rebut the qualified immunity defense, the plaintiff must show: (1) that he has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident. Id. (citing Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998)). The Court has discretion to decide which of the two prongs of qualified immunity should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 l. Ed. 2d 565 (2009).

## DISCUSSION

To reiterate, the sole issue currently before the Court for the purposes of this opinion is whether Sheriff Brad Lance and former Sheriff W. Shelton Ingram are entitled to qualified immunity.

I.     Qualified Immunity - Sheriff Brad Lance

Lenz's response solely addresses former Sheriff Ingram. Lenz offers neither argument or evidence that Sheriff Lance, who was the chief deputy (though not present at the jail) during the incident, is not entitled to qualified immunity. Because Lenz had the burden of negating Lance's entitlement to qualified immunity and failed to do so, the Court GRANTS Defendants' Motion for Summary Judgment as to Lenz's individual capacity claims against Sheriff Lance.

II.    Qualified Immunity - Former Sheriff W. Shelton Ingram

There is no evidence that Sheriff Ingram was at the jail during Lenz's incarceration from around 12:30 a.m. on Friday, July 27, 2007 to around 8:00 p.m. on Saturday, July 28, 2007, or that Ingram was even aware of the situation until after Lenz had been taken to the hospital. However, Lenz argues that Ingram is still liable in his capacity as a supervisor of the jail on a theory of failure to train or supervise. As stated above, to overcome qualified immunity, Lenz must demonstrate (1) a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident. Waltman, 535 F.3d at 346.

As a pretrial detainee, Lenz had a clearly established Fourteenth Amendment right not to be denied, by deliberate indifference, attention to his serious medical needs. Brown, 623 F.3d at 253. However, "[u]nder section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." Thompson v. Upshur Cnty., 245 F.3d 447, 449 (5th Cir. 2001) (citing Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987)). Rather, the plaintiff must show that the supervisor's own conduct deprived the plaintiff of his or her constitutional rights. Estate of Davis v. City of N. Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005).

"A sheriff not personally involved in the acts that deprived the plaintiff of his constitutional rights is liable under section 1983 if: (1) the sheriff failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." Thompson, 245 F.3d at 447. The Supreme Court has stated that "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011).

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L .Ed. 2d 626 (1997). Deliberate indifference implies an official's actual knowledge of facts showing that a risk of serious harm exists as well as the official's having actually drawn that inference. Smith v. Brenoettsy, 158 F.3d 908, 912 (5th Cir. 1998) (internal quotation marks and citations omitted). Deliberate indifference is more than mere negligence or even gross negligence. Brown, 623 F.3d at 256. Proof of a single instance normally will not sustain a plaintiff's claim that a lack of training or supervision caused a violation of his constitutional rights. Cozzo v. Tangipahoa Parish Council, 279 F.3d 273, 286-87 (5th Cir. 2002) (citing Thompson, 245 F.3d at 459). Rather, a plaintiff generally must show a pattern of violations and that the inadequate training or supervision is "obvious and obviously likely to result in a constitutional violation." Estate of Davis, 406 F.3d at 381 (citations omitted).

Here, Lenz argues that Sheriff Ingram failed to provide medical training to his staff, including training on recognizing serious medical conditions such as head injuries that require immediate attention, and that this lack of training "was the driving force behind policies which

9

caused the lack of medical care which allowed Lenz's injures to become so horrific."

The evidence in the record reveals the following: The Tate County jail did not employ a full-time nurse or other trained medical personnel, but instead contracted with a physician who visited the jail several times a week to see to the needs of the inmates. The doctor was also available for emergencies, but if he was unavailable or the situation was severe, EMS would be contacted. Regarding jail staff training, administrator George Hullette, who was responsible for the day-to-day operations of the jail, testified that new hires were given a copy of the policy and procedure manual[7] and required to attend the State jail training course. There was apparently no fixed time frame for attending the State course, but Hullette testified "we always try to get them over there within one year." There is no evidence in the record regarding what training was provided by the State course. At the time of the incident, Officer Williams had been working at the jail for over a year and had not yet completed the State required course. However, Williams stated that he received on the job training from other officers on how to protect the inmates, which consisted of "[w]atching and observing and monitoring inmates." He also said that Hullette "told me about the policies of the jail." Sheriff Ingram testified that he was unsure if his staff received any medical training beyond the training mandated by the State, but if they did, "it was no great extent, I'm sure."

According to Sheriff Ingram, the standard policy of the jail regarding medical care for inmates was, "if an inmate requested, even if he didn't look like he needed medical attention, to get medical attention." Regarding a situation where an inmate could not request medical care, Sheriff Ingram testified that "if it was obvious they needed medical attention, then medical attention was provided." For example, "if they were down and couldn't get up or wouldn't respond when you

---

[7]The manual is not included in the record.

looked at them, they would call EMS and they would transport [the inmate] to the hospital."

Even assuming arguendo that Ingram failed to properly train or supervise the jail staff, and there is a causal connection between the failure to train/supervise and a violation of Lenz's constitutional rights, Lenz has failed to etablish a genuine issue of material fact that Sheriff Ingram's training or supervision of the jail staff constituted deliberate indifference. There is no evidence in the record that any other inmates in the Tate County jail had ever previously suffered serious health problems which the jail personnel handled inappropriately. In fact, the uncontested affidavit of Sheriff Lance states, "there was never a finding of a violation for the civil rights of an inmate during the entire administration of Sheriff Ingram." As stated above, a finding of deliberate indifference generally requires "[p]roof of more than a single instance of lack of training or supervision causing a violation of constitutional rights" and "at least a pattern of similar violations," and "the inadequacy of training must be obvious and obviously likely to result in a constitutional violation." Thompson, 254 F.3d at 459 (citations omitted).[8] As the Fifth Circuit has said, "[t]he ultimate question is not whether a jury, in hindsight, could conclude that the Sheriff could have engaged in better supervision of the jail's medical care but whether his supervision was so utterly heedless as to amount to deliberate indifference." Brown, 623 F.3d at 256. That stringent standard is not met here.

Even if Lenz had shown a constitutional violation on the part of Sheriff Ingram, he has nevertheless failed to prove, under the second prong of the qualified immunity analysis, that Sheriff Ingram's conduct was objectively unreasonable in light of clearly established law at the time of the

---

[8] Lenz does not contend, nor is there a basis for finding, that his treatment falls within the "single incident" exception to the usual requirement that to prove deliberate indifference, a supervisor must be on notice of a pattern of similar unconstitutional behavior. Estate of Davis, 406 F.3d at 382, 383.

11

incident. "To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. There need not be 'commanding precedent' that holds that the 'very action in question' is unlawful; the unlawfulness need only be 'readily apparent from relevant precedent in sufficiently similar situations.'" Brown v. Miller, 519 F.3d 231, 236 (5th Cir. 2008) (citations omitted). Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury. Williams v. Bramer, 180 F.3d 699, 703 (5th Cir.1999). In essence, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper. Babb v. Dorman, 33 F.3d 472, 477 (5th Cir. 1994). Lenz has failed to do so.

In the somewhat similar case of Thompson v. Upshur County, a pretrial detainee died of a medical condition associated with delirium tremens (DTs) from alcohol withdrawal. Thompson, 245 F.3d at 454-55. Like Sheriff Ingram, the sheriff in Thompson had no knowledge of the incident, but the plaintiffs asserted claims under § 1983 for failure to train employees to treat detainees with delirium tremens. The trial court denied the sheriff's motion for summary judgment based on qualified immunity, and the Fifth Circuit reversed. Id. at 257. While acknowledging that delirium tremens is a serious medical condition, the Court noted the lack of precedent establishing the need to "have their jail personnel medically trained respecting the likely medical seriousness of an inmate suffering from DTs and the need to have such an inmate promptly receive medical care" Id. at 463.

The Court finds that the Plaintiff has produced no relevant authority suggesting that it is clearly established that the training provided by Sheriff Ingram was constitutionally inadequate. Plaintiff's reliance on Lancaster v. Monroe County, 116 F.3d 1419, 1426 (11th Cir. 1997), Colle v.

12

Brazos County, 981 F.2d 237 (5th Cir. 1993), and Fielder v. Bosshard, 590 F.2d 105, 107 (5th Cir. 1979) is misplaced.  As the Fifth Circuit stated in Thompson, "Fielder and Lancaster establish that DTs is a serious medical need and Colle denied qualified immunity when policies were in place that prevented serious medical needs (in Colle, DTs) from being met.  These cases do not clearly establish that sheriffs must provide medical training on the dangers posed by DTs, only that they not have policies in place that preclude serious medical needs, like DTs, from being met." Thompson, 245 F.3d at 462.  Similar to the sheriff in Thompson, Lenz has not identified "any policies promulgated by Sheriff [Ingram] that would deny or even impede the prompt provision of medical care to a detainee in distress." Id.  Additionally, although the record is sparse on this point, the jail staff were provided at least some basic level of training.  The Court cannot say, based on the record before it, that Sheriff's Ingram's actions were objectively unreasonable in light of clearly established law.

  2. Ratification

Lenz's second theory of supervisor liability is that Sheriff Ingram ratified or condoned an unconstitutional policy of failing to check on inmates placed on suicide watch every fifteen minutes. Lenz argues that the suicide watch logs show that a least six jailers working on different shifts regularly disregarded the written instructions on the suicide log and also ignored verbal instructions to check on inmates on suicide watch every fifteen minutes.  Lenz notes that "not one jailer reported any reprimand, caution, or corrective action for failing perform checks every fifteen minutes."  Lenz argues that Sheriff Ingram may "be liable for ratifying or condoning the practice or custom of numerous jailers who repeatedly delayed an hour or more in checking on inmates who had been determined to be in such danger of sustaining injury or suffering deteriorating medical conditions

13

that the inmate needed to [be] checked on every 15 minutes such that the custom or practice was 'so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind the constitutional violation.'" However, Lenz fails to further develop this argument or explain how the staff's failure to strictly adhere to the jail's internal policy of inmate checks is "itself . . . a repudiation of constitutional rights" or "the moving force behind the constitutional violation." Essentially for the reasons stated above, Lenz has failed to establish a genuine issue of material fact as to whether Sheriff Ingram was deliberately indifferent to his constitutional rights in this respect. Furthermore, Lenz offers neither argument nor authority demonstrating that Sheriff Ingram's actions were objectively unreasonable in light of clearly established law. Therefore, the Court finds that Sheriff Ingram is entitled to qualified immunity.

III.   Qualified Immunity - John Does

Lenz's response also asserts that the fictitious "John Doe" defendants named in the first amended complaint, who Lenz now contends are known to him as employees of the Tate County jail, are not entitled to qualified immunity.[9] However, this issue was not raised in Defendants' Motion for Summary Judgment and is not before the Court at this time.

IV.   Federal Municipal Claims

As stated in its August 9, 2011 Order, this Court deferred ruling on Defendant's Motion for Summary Judgment as to Lenz's municipal liability claims due to all non-qualified immunity related discovery being stayed. The issue of qualified immunity having been resolved, the parties are directed to consult with the Magistrate Judge within seven days to develop an appropriate scheduling

---

[9]Lenz subsequently filed a second amended complaint replacing the John Doe defendants with named parties.

order allowing for the completion of discovery regarding these claims.

## CONCLUSION

The Court grants Defendants' Motion for Summary Judgment in part and defers ruling in part, pending further discovery. A separate order will issue in accordance with this opinion.

SO ORDERED on this, the 5th day of January, 2011.

                                                    /s/ Sharion Aycock               
                                        **UNITED STATES DISTRICT JUDGE**